## Watts v. Bryant.

(Decided May 30, 1911.)

## Appeal from Whitley Circuit Court.

Lands—Title—Adverse Possession—What Must be Shown—In order to establish title by adverse possession, it must clearly appear that the claimant has occupied the land openly, adversely and notoriously for a period of fifteen years or more continuously, claiming same to a well defined or marked boundary line.

S. B. DISHMAN, H. C. FAULKNER, R. T. HEMPHILL and J. N. SHARP for appellants.

T. Z. MORROW, E. L. STEPHENS and GEO. P. JOHNSON for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

This appeal involves the ownership of 512 acres of land in Whitley County, Kentucky. Roberta S. Bryant, alleging that she was the owner and in the possession thereof, brought a suit to enjoin and restrain S. J. Watts and others from cutting timber on the land. The defendant Watts answered, traversing plaintiff's allegation of ownership and title, set up title in himself, and asked that same be quieted in him. The affirmative matter in the answer and counterclaim was traversed, and upon this issue the case was submitted, upon the pleadings, exhibit and proof, for judgment. The chancellor found in favor of the plaintiff, and the defendant, Watts, appeals.

The plaintiff's claim to title is rested upon a patent from the Commonwealth for 10,000 acres, dated October 18, 1854, known as the Hudson & Wait patent. By an unbroken chain the plaintiff traces her title through this patent to the Commonwealth. The defendant, Watts, rests his claim upon the adverse holding of one M. M. Wyatt, who, it is claimed, entered upon the land under a title bond executed to him by one Joe Gilliss in 1852. Wyatt sold to his nephew, Ben W. Wyatt, and he conveyed to the appellant, Watts.

A great mass of testimony has been taken, much of which throws little light upon the mooted question as to whether or not M. M. Wyatt held this land in such a way

and for such length of time as to create, uphold and support a claim of title by adverse possession. It is conceded that, if he continuously occupied and claimed the boundary of land set out in the petition openly, adversely and notoriously, so as to give the owner of the legal title notice of his holding, for more than fifteen years, then the judgment of the lower court is erroneous and should be reversed. In Courtney v. Ashcraft, 105 S. W., 106, it is stated that the holding must have been such as would have been sufficient to put any one entering upon the land upon notice that it was being held adversely. The evidence shows that most, if not all of the land in controversy was a virgin forest. It was unenclosed, and M. M. Wyatt, through whom appellant claims, and upon whose possession he must rely, testifies that he did not know its exterior boundary lines, and the paper offered as a title bond is so vague, indefinite and uncertain as to be utterly valueless as an aid or guide in determining where these exterior boundary lines run. Recently the exterior lines of the boundary claimed by appellant have been marked, painted or designated in such a way that they are now easily run. But these acts tend to confuse rather than aid in elucidating the question.

It is argued that Joseph Gilliss, prior to the death of the execution of the title bond to M. M. Wyatt, had surveyed this land. This is merely a surmise, however, for neither the records of Whitley County nor those in the register of the land office at Frankfort show that any such survey was ever made. Joseph Gilliss did in fact own several surveys of land in that part of Whitley County, and it is most earnestly insisted that the land, upon which M. M. Wyatt lived and which he claimed, was a portion of an 800 acre tract in the name of Joseph Gilliss, and that it was not until some years after he had occupied said land that he discovered that his dwelling house was not upon part of this 800 acre survey. There is evidence in the record which tends to support this theory. The title bond furnishes no aid or guide whatever by which one would be enabled to locate this land. All that can be said of it is that it is in Whitley County, Ky., on Dogslaughter and Bunch's creek as is evidenced by the description, which is as follows:

"This boundary of land lies on Dogslaughter and Bunch's Creek in Whitley County, Kentucky, and bounded as follows:

"Beginning on a white oak, thence north to a stake, thence westward to a poplar, thence southward to a black gum, thence southwest to a stake, thence westward to a stake, thence southeast to a black oak, thence westward to a black oak, thence westward to a stake, thence to a black oak, thence south to a black oak, thence southward to a stake eastward next to a stake, thence to a forked rock and maple, thence to the beginning, said boundary to contain six hundred acres, to be the same, more or less, the party of the second part has paid the remainder ten dollars to the party of the first part, etc."

If this writing was in fact executed as and for a title bond by Joseph Gilliss, it was kept by M. M. Wyatt until 1908, and for about three years after he had sold the land to his nephew, Ben W. Wyatt, when it was proven before a notary public and placed of record; after which it is claimed it was lost, and, up to the time of the trial, had not and could not be found.

It is argued with much force that, as Joseph Gilliss was a well educated, good business man, and a surveyor of many years' experience, having been the surveyor of that county from 1818 to 1842, he would not have prepared as a title bond a paper so vague, indefinite and meaningless. It is further shown by a decided preponderance of the evidence that Joseph Gilliss always wrote his name "Joseph," whereas this writing purports to have been signed "Joe." Ben W. Wyatt testifies that he did not realize the importance or necessity of having this title bond recorded until after he had conveyed the land to the appellant, Watts, and that then he sent the notary to see his uncle and have him prove the genuineness of the title bond by his oath. The notary testifies that M. M. Wyatt took this title bond from his pants pocket, that he is not sure whether it was written in pencil or pale ink, and that from use it was worn almost in two. The hand writing of Joseph Gilliss was known to many people in that locality, and had this title bond been preserved it would have of itself furnished the best evidence of its genuineness. The fact that it was lost immediately after it was placed of record is a circumstance which, taken together with other evidence in the record, lends color to the charge that it was not genuine.

But even if it was genuine it would be of no value in determining or locating the exterior lines of the land which it purported to convey. Appellant took the deposition of M. M. Wyatt, who was living at the time this suit was being prepared for trial. He was then eighty-three years of age. Upon the question of the location of the boundary of the land which he bought, he testified as follows:

"1. Was the boundary pointed out to you at the time you bought it from Joe Gilliss?

"A. He told me around where I had bought to and we did not go out to look at it. We allowed we could run it out later. He died shortly afterwards.

"2. Did Gilliss execute a title bond for the land you bought from him at that time?

"A. Yes, sir.

"3. I'll read you the calls and title bond purporting to be from Joe Gilliss to M. M. Wyatt and dated June 15, 1852, a copy of which is filed with and as part of this question, and ask you if it is the bond executed by Gilliss at the time?

"A. I expect it is, it may be, it has been so long ago, I can't remember. It must be it if his name is to it.

"4. Does that describe the boundary of land you bought from Joe Gilliss?

"A. I guess that is the land, we did not run it. It sounds like it.

"5. Do you know the location of the trees called for in this bond?

"A. I never was around at the trees in my life, I kept looking for Gilliss around to run it until I heard he was dead and that wound it.

"6. What was the general boundary of the land?

"A. Between Dogslaughter and Bunch's Creek and as far as it (the survey) went, the other way."

From this it will be seen that he did not know the exterior boundary lines of the land which he is claiming. They were never run or shown to him and it is impossible that he could have known them, for, as Gilliss, according to his own testimony, died without having shown them to him or run them for him and the deed fails to furnish

any guide toward finding them, the testimony of those witnesses who say that M. M. Wyatt pointed out to them the exterior boundary lines of this tract can not be accepted as of any value.

It is urged by appellant's counsel that M. M. Wyatt was so enfeebled by disease and the weight of years when he gave this deposition that little weight should be given his testimony. But to this we can not agree. He testified rationally and apparently remembered the events of many years before quite well and accurately, a characteristic not uncommon to men of his age. But, aside from this, appellant introduced him, and seeks to rely upon him his testimony upon many points to make out his case. He can not make him a competent witness when it suits him and then repudiate his testimony upon points not in his favor. He was about eighty-three years of age when called upon to prove this paper offered as a title bond. He is relied upon to show the adverse holding of this property for forty or fifty years. If he was competent in these particulars he certainly was competent upon other points about which he testified, which are material to the issues.

Inasmuch as M. M. Wyatt did not know the location of the exterior boundaries of the land in dispute,he could not have been claiming or holding same to a well-defined boundary line, and hence, at most, his possession would extend only to so much of the land in controversy as he had actually enclosed. This was a very small portion— one tract of four or five acres, and another of perhaps ten or twelve. But as to this, he testified that when he bought from Gilliss he understood that he was buying a part of the eight hundred acre tract. This is doubtless true. Recent surveys show that the points at which the two houses which he at different times occupied were located are near the lines of this eight hundred acre survey, and it is altogether probable that he was, during all the time that he occupied the land, laying claim to it as a portion of the eight hundred acre survey, and not otherwise.

The proof shows that the land in question is worth from $7,000 to $8,000, that the timber on it is quite valuable, that M. M. Wyatt sold it to his nephew for $2 cash and something like $250 to be thereafter paid, and B. W. Wyatt sold it for $500, of which only $30 or $40 was

paid in the shape of taxes. Viewed from any standpoint, it is apparent that neither M. M. Wyatt nor Ben W. Wyatt regarded the title to this property as good, else they would not have been willing to dispose of it at such a tremendous sacrifice.

There is much in the evidence that is contradictory and far from satisfactory, but upon the whole we are satisfied that the chancellor reached the right conclusion, for, in order to establish a title by adverse possession, it must clearly appear that the claimant has occupied the land openly, adversely and notoriously for a period of fifteen years or more continuously, claiming same to a well-defined or marked boundary line.    The evidence in this case does not measure up to these requirements.

Judgment affirmed.